Magistrate Judge Michelle L. Peterson

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff

v.

SHANTE BROADY,

Defendant.

CASE NO.   MJ25-197

COMPLAINT for VIOLATION

Title 18, U.S.C.
Sections 1591(a)(1), 1591(b)(1) and 2422(a)

BEFORE the Honorable Michelle L. Peterson, United States Magistrate Judge, United States Courthouse, Seattle, Washington.

The undersigned complainant being duly sworn states:

## COUNT ONE

**Sex Trafficking of an Adult Female (AV2) by Force, Fraud, and Coercion**

Beginning in or about March 2025, and continuing until on or about April 8, 2025, in King County, within the Western District of Washington, and elsewhere, SHANTE BROADY knowingly, in and affecting interstate and foreign commerce, recruited,

Complaint - 1
*United States v. Broady* / USAO 2025R00181

enticed, harbored, transported, provided, obtained, and maintained by any means, an adult female, AV2, knowing that force, fraud, and coercion, and any combination of such means, would be used to cause AV2 to engage in commercial sex acts.

All in violation of Title 18, United States Code, Sections 1591(a)(1) and 1591(b)(1).

## COUNT TWO

**Transportation of an Adult Female (AV2) for the Purpose of Prostitution through Coercion and Enticement**

During March 2025, in King County, within the Western District of Washington, and elsewhere, SHANTE BROADY knowingly persuaded, induced, enticed, and coerced an adult female, AV2, to travel in foreign commerce, that is, from the country of Canada to the State of Washington, to engage in prostitution and sexual activity for which any person can be charged with a criminal offense.

All in violation of Title 18, United States Code, Section 2422(a).

And the complainant states that this Complaint is based on the following information:

I, Anne Borgertpoepping, being first duly sworn on oath, depose and say:

1. I am a Special Agent with the FBI and have been since approximately July 2020. I am assigned to the Seattle Field Office's Crimes Against Children and Human Trafficking Task Force. As an FBI Special Agent, I have participated in investigations involving the violations of various federal laws, including laws related to terrorism, child exploitation, and sex trafficking. I have gained experience through training at the FBI Academy in Quantico, Virginia, and through everyday work conducting investigations. I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

Complaint - 2
*United States v. Broady* / USAO 2025R00181

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

2.      The facts set forth in this Affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; review of documents and records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience.  Because this Affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

### THE INVESTIGATION

**Minor Victim 1 (MV1)**

3.      On January 28, 2025, at approximately 7:45 p.m., FBI Seattle received a report from a woman named H.R. that her seventeen-year-old daughter, L.P. (hereinafter referred to as "Minor Victim 1" or "MV1"), with a date of birth of December XX, 2007, had run away from her boarding school in Lexington, Texas to fly to Seattle.  H.R. further stated that she believed that MV1 had been enticed to fly to Seattle by an unknown individual whom she (H.R.) believed to be involved in sex trafficking.  H.R. said that MV1's friends said that MV1 had told them that she had been talking online with this unknown individual for a couple months.  H.R. advised that when MV1 was fourteen, she had been groomed online and taken by gang members who sexually assaulted her. I was able to locate an internal FBI document detailing the FBI's assistance to the Pleasant Hill Police Department, in recovering MV1. The report provided minimal detail regarding the circumstances of the event.

4.      H.R. reported that she believed the alleged trafficker had purchased MV1 a plane ticket on Alaska Airlines flight number 723 to fly from Austin, Texas to Seattle.  A surveillance camera at MV1's school showed her leaving the school grounds around 11:30 p.m. on January 26, 2025.  H.R. stated that at approximately 6:16 a.m. on January

27, a $35 charge appeared on MV1's ATM card for Alaska Airlines.  Historic flight information showed that an Alaska Airlines plane had flown out of Austin-Bergstrom International Airport, the closest airport to MV1's school, at approximately 7:29 a.m. CST on January 26.  After learning this information, I requested and received flight and ticket information from FBI Seattle Airport Liaison SA Minh Truong. SA Truong has a contact at Alaska Airlines who advised an airline ticket had been purchased for MV1 to fly from Austin to Seattle on Alaska Airlines; however, that ticket was not purchased through Alaska Airlines directly, but was instead purchased through Priceline. Because of this, no payment or purchaser information was available.

5.      Law enforcement subsequently filed an administrative subpoena to Priceline for further information.  According to records received from Priceline, an individual by the name of TIM BROADY purchased the airline ticket for MV1 on January 22, 2025.  The last four digits of the card (0273) and the BIN (403905) indicated that the card used was a Visa prepaid card. The records further indicated that the phone number associated with the purchase was 206-698-0810.

6.      Special Agent (SA) Andrew Butler confirmed via an online flight tracker that the Alaska Airlines flight 723 departed Austin, Texas on January 27, 2025 at approximately 7:29 a.m. CST and landed in Seattle at approximately 10:05 a.m. PST.

7.      Later that evening, MV1 posted a story on her Instagram account that depicted a view from a high-rise building. The story was captured by one of MV1's friends who sent it to H.R., who then provided it to the FBI during her report.  H.R. told law enforcement that she believed that MV1 was staying in this building and that a reverse image search on Google indicated that the building was in the vicinity of 2121 6th Street in Seattle. After reviewing the same video, SA Butler and I determined the story had actually been filmed in the vicinity of 2121 6th Avenue Seattle because of the location in reference to the Amazon Spheres.

Complaint - 4
*United States v. Broady* / USAO 2025R00181

8. H.R. advised law enforcement that MV1 had told her friends that she was traveling to Seattle to meet with a 37-year-old Black male who was a "pimp" and had a history of armed robbery. Additionally, H.R. reported MV1 told her friends that she planned to walk the streets until she was eighteen and could move to escort service. H.R. provided law enforcement with screenshots of MV1's communications with her friends using both her Snapchat account and her Instagram account.

9. On or about January 27, 2025, MV1 sent the below photograph via her Snapchat account to her friend. The photo depicted MV1's face, as identified by myself and H.R. Through my training and experience, I am familiar with the appearance of a Snapchat photograph and positively identified the platform as being where the photograph was sent. I am aware that users utilizing the Snapchat application can also add text over the photograph. In this case, MV1 had typed the following across her photograph, "i ran away from rvca and am moving in w my pimp daddy if anyone asks don't say anything love u [followed by two emojis]." I know "rvca" to stand for River View Christian Academy which is where MV1 was attending school according to H.R. Below are screen shots of MV1 discussing travel from Austin to Seattle, who purchased the tickets and how much they were charging for commercial sex acts.

Complaint - 5
*United States v. Broady* / USAO 2025R00181

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970




10.     On January 29, 2025, I received the above-referenced screenshots from H.R., who had received them from MV1s friends on January 27, 2025.  MV1's friends sent them to H.R. to alert her of MV1's travel to Seattle. The screenshots are of conversations taking place on Snapchat and Instagram. The top screenshot, which appears to have been sent from MV1's Snapchat account, depicts MV1 confirming she did not buy the plane ticket.  MV1's friend asked, "so he bought you a plane ticket," to which MV1 replied, "yes and I'm going to make $$$$."

Complaint - 6
*United States v. Broady* / USAO 2025R00181

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

11. The next three screenshots all appear to have been sent from Instagram. The left screenshot shows MV1 telling her friend about the man she is staying with. MV1 states "He's like my boss. But we fuck & he likes me. Yes so sexy. He black. 5'11…" In the middle screenshot, MV1's friend asks "Wait, didn't you just meet him?" to which MV1 replies, "ya hit me couple months ago finally got back to him & worked it out." MV1 again confirms that this individual paid for her plane ticket. In the screenshot on the right, MV1 tells her friends how much money is exchanged for her time. MV1's friend asks, "what's his price? 20 for bj?" to which MV1 responds: "150 20 min under, 250 30 min, 500 hour" "Over night 2k." MV1's friend stated "i didn't know they charge that much." and MV1 replied "For me yes [emoji]." In my training and experience, statements like "150 20 min under, 250 30 min, 500 hour," are consistent with the amount of money sex traffickers instruct their victims to charge customers for sex acts.

12. Through training and experience, I am familiar with both Snapchat and Instagram platforms and the way they present on cellular devices. Based on the format of the top photograph, I believe it to be from MV1's Snapchat account. I believe that the other three screenshots, based on color and format, are from her Instagram account. Additionally, H.R. was able to confirm both platforms and usernames associated with each platform, thus further clarifying which conversation took place on which platform.

13. H.R. provided law enforcement with phone records showing calls to and from the phone that MV1 was using before she ran away from her school. These records showed that a Seattle area phone number, 206-698-0810, contacted MV1 ten times between January 19 and 20, 2025, before she ran away from her school. This is the same phone number that Priceline records indicated had purchased the Alaska Airlines flight from Austin to Seattle. According to subscriber information received on March 4, 2025, via administrative subpoena, from T-Mobile for phone number 206-698-0810, the number belonged to SHANTE BROADY from January 15, 2025 to January 30, 2025.

Complaint - 7
*United States v. Broady* / USAO 2025R00181

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

14.	On January 29, 2025, SA Andrew Butler interviewed the manager of the Via6 apartments.  Via 6 apartments is located at 2121 6th Avenue in Seattle and is the presumed location of MV1's Instagram story that she posted on the night of her arrival to Seattle.  The manager of the Via6 apartment building confirmed that BROADY's phone number is (206) 698-0810 and that he resided in apartment North 1606 at the Via Apartments located at 2121 6th Avenue in Seattle. This information was voluntarily provided to SA Butler by the apartment manager.  The apartment manager also confirmed that Apartment North 1606 had a view consistent with the videos shown on MV1's Instagram story.

15.	I have reviewed BROADY's criminal history.  I am aware that BROADY is a four-time felon and was sentenced to fifteen years imprisonment after being convicted of armed burglary in Virginia.  Law enforcement checks also showed that BROADY is currently under the supervision of the Washington State Department of Corrections.  After learning this, SA Butler contacted Community Corrections Officer Mary Bullard, who confirmed that BROADY was on Washington Department of Corrections (DOC) supervision and had been complying with mandatory check-ins.  Officer Bullard further confirmed that BROADY had told DOC that his phone number was (206) 698-0810 and his address was 2121 6th Ave, Apartment North 1606 in Seattle.  Officer Bullard advised that BROADY had reported that he was employed by Grey Star maintenance company, located at 2121 6th Ave Seattle, Washington.  The Via6 apartment manager confirmed to SA Butler that BROADY had previously worked at Grey Star, but his employment was terminated after fellow employees overheard BROADY discussing sex trafficking of women on the phone.

16.	On January 29, 2025, at approximately 4:00 p.m., SA Butler established surveillance along Aurora Avenue North in North Seattle.   Law enforcement is aware that this portion of Aurora Avenue is a high-prostitution area and that many trafficking victims are directed by their traffickers to walk this area in order to meet potential

Complaint - 8
*United States v. Broady* / USAO 2025R00181

prostitution customers. At approximately 4:05 p.m., SA Butler observed a female matching the description of MV1 in the vicinity of 13501 Aurora Ave North, which is an area known to law enforcement as an area frequented by individuals engaged in commercial sex. The female wore silver high heels, black fishnet bottoms, maroon underwear, black fishnet top, and a black jacket. After learning what SA Butler had seen the female believed to be MV1 was wearing, I provided SA Butler with the screenshot of a photograph that MV1 had sent to her friends on Instagram, sometime between January 27 and 28, 2025, shortly after she arrived in Seattle. MV1's friends had provided the photo to H.R., who then gave it to law enforcement. The screenshot depicted MV1 wearing the same black jacket, fishnets, maroon underwear, and navel piercing as the female observed by SA Butler.

17. SA Butler coordinated with Seattle Police Department (SPD) to contact MV1, who was listed as a missing person in the National Crime Information Center (NCIC). SPD officers approached MV1 at approximately 4:20 p.m. on January 29, 2025. After being contacted, MV1 fled the scene on foot and fell into a ditch before she was detained by officers. During her flight, MV1 took off her jacket and her iPhone fell on the ground next to her. SA Butler subsequently collected MV1's iPhone and without manipulating the phone observed several notifications from a contact labeled "Daddy." I am aware from training and experience and conversation with other law enforcement officers who investigate sex trafficking crimes that sex traffickers will force their victims to refer to them as "Daddy."

18. Law enforcement transported MV1 to SPD's North Precinct for an informational interview conducted by SA Butler and me. MV1 reported that she had arrived in Seattle from Austin on January 27, 2025, for the purpose of engaging in commercial sex. MV1 stated that she had traveled to Seattle by herself and planned to engage in commercial sex by herself. MV1 confirmed that she took a 7:00 a.m. flight on Alaska Airlines from Austin to Seattle. MV1 also said that she had purchased her flight

Complaint - 9
*United States v. Broady* / USAO 2025R00181

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

from Austin to Seattle using prepaid debit cards to avoid being tracked. She further stated that she had purchased a new cell phone prior to arriving in Seattle and discarded her previous cell phone. She said that the phone that SA Butler had collected was the new cell phone she began using when she arrived in Seattle.

19. MV1 stated that upon arriving in Seattle, she took an Uber directly from SeaTac International Airport to meet with a commercial sex buyer with whom MV1 had previously coordinated via Snapchat. MV1 said that the buyer paid her approximately $1,200 cash for engaging in commercial sex. MV1 said that she continued to periodically engage in commercial sex with customers she met while walking on Aurora Avenue and in the hotels in the area until she was contacted by law enforcement. MV1 stated that she made $2,000 in cash from engaging in commercial sex during her time in Seattle. MV1 reported she did not have any cash on her person or in her pockets, and said that she stored the cash in the black purse that she hid under a vehicle in the parking lot of 13501 Aurora Ave North in Seattle.

20. Notably, SA Butler had not observed MV1 with a purse while he was observing her on surveillance. Furthermore, SPD contacted MV1 approximately two blocks from where she claimed to have hidden the purse. I know from training and experience, as well as conversation with other law enforcement officers who investigate trafficking crimes, that most traffickers will instruct their victims to deny any involvement with a pimp if they are encountered by law enforcement. Based upon these circumstances, it is my conclusion that MV1 may have made up this story about the purse to hide the fact that she had actually given the proceeds from engaging in commercial sex to her trafficker, who may have been loitering in the area.

21. After concluding this brief informational interview, I contacted H.R. to arrange for MV1 to be returned to her custody in California. H.R. agreed to purchase a plane ticket for MV1 from Seattle to San Jose for later in the evening of January 29, 2025. Agents coordinated with FBI Seattle Airport Liaison SA Minh Truong to facilitate

Complaint - 10
*United States v. Broady* / USAO 2025R00181

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

MV1's transfer through TSA security and coordinate boarding with Alaska Airlines. SA Butler and I transported MV1 from SPD North Precinct to SeaTac International Airport.

22.    Once at the airport, MV1 was escorted by agents, Port of Seattle Police Department/Task Force Officer (TFO) Josh Landers, Federal Air Marshall (FAM) Adrian Monticelli and a Port of Seattle uniformed officer who escorted MV1 through TSA security and to the Alaska Airlines departure gate. At approximately 9:15 p.m., MV1 successfully checked in and proceeded down the skybridge to get on the plane. The aforementioned agents and other law enforcement officers waited and saw the sky bridge retract from the plane and the plane taxi to the runway.

23.    At approximately midnight on January 30, 2025, I received a call from H.R., who told me that MV1 did not exit the plane in San Jose.  Port of Seattle TFO Landers subsequently advised that an airport maintenance worker had located MV1 hidden in a maintenance locker on the sky bridge. The maintenance worker who located MV1 did not report his discovery to law enforcement.

24.    FBI agents subsequently reviewed video surveillance footage from SeaTac airport and determined that MV1 had left the airport and was headed toward the light rail platform at approximately 11:20 p.m. that evening.  MV1 was last seen exiting at the Broadway and East John Street station in Seattle's Capitol Hill at approximately 11:57 p.m. on January 29, 2025.

25.    MV1 is still currently missing but periodically checks in with friends via Instagram.

**Adult Victim 1**

26.    On April 4, 2025, I received an email from the FBI National Threat Operations Center (NTOC) alerting me of a tip received involving two adult trafficking victims, K.M. (hereinafter referred to as Adult Victim 1 or AV1) XX/XX/2000, and B.V. (AV2) XX/XX/1999, who is from Canada (hereinafter referred to as Adult Victim 2 or

Complaint - 11
*United States v. Broady* / USAO 2025R00181

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

AV2). AV1 submitted the tip and identified BROADY as the individual who had attempted to traffic her and successfully trafficked AV2.

27.     Subsequently, on April 4, 2025, Special Agent Owen Reese and I went to AV1's residence and interviewed both victims. AV2 explained that she was staying with AV1 for safety until she could arrange travel back to Canada. The victims were interviewed individually but in the same room. AV1 told her story first and then AV2 told her story.  During the interview, AV1 stated that she met BROADY on or about March 16, 2025, when he added her on Snapchat. In my training and experience adding someone as a contact on Snapchat, and that person accepting, means you can now message, send photographs, etc. to that person through the application.  Snapchat has a "Quick add" or "Find Friends" feature that suggests other users an individual might know based on mutual friends, contacts or application activity. The quick add feature is likely how BROADY found AV1.  AV1 said BROADY immediately started sending her pictures and introduced himself as "Tae." His Snapchat display name was "Steady Grooven."  During open source and FBI systems checks at the beginning of this investigation, BROADY's Snapchat was also identified as having a display name of "Steady Grooven" and a username of "tae_loc20."  At this time, AV1 was living in her current residence in Seattle.

28.     AV1 said that after BROADY added her, they began communicating through Snapchat's messaging feature. Snapchat's messaging feature automatically deletes after 24 hours so AV1 was unable to produce any of the messages.  According to AV1, during these conversations, BROADY indicated he was interested in a romantic relationship with AV1. AV1 told BROADY she was not interested in anything right now because she was going through a hard time. BROADY asked AV1 what was going on and AV1 shared with him that she had recently been laid off of work and did not have a current source of income.  In response, BROADY said he could change that for her and suggested she make money through Only Fans or by working in an escort service. AV1

Complaint - 12
*United States v. Broady* / USAO 2025R00181

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

stated that she had never been interested in or participated in either of these and had no idea how an escort service worked. She asked BROADY questions about being an escort. but he got angry when she asked for more detailed information on how it worked. BROADY said that he did not want to text about it but suggested they discuss over FaceTime.

29.     During this discussion, BROADY told AV1 she could make $30,000 a month by escorting.  BROADY stated that they would post ads on escort websites such as Eros.com and Skipthegames.com and AV1 could then meet up with the men who responded to her advertisements.  BROADY told AV1 that ninety percent of the time the men will just talk your ear off for either 30 or 60 minutes, that AV1 should try to keep them talking rather than having sex, and that is how she could earn easy money. BROADY told AV1 that he would provide her and anyone else he brought to the "team" with protection when they met with the men who responded to the escort advertisements. BROADY also stated that he would keep the money AV1 earned through escorting, but he would buy her whatever she needed. In my training and experience, BROADY's reference to a "team" meant he was working towards having multiple women working for him in an escort or commercial sex capacity.

30.     AV1 stated that she went to meet BROADY that night at his current apartment, which was located at 100 Taylor Avenue North, Apartment A220, in Seattle. AV1 wanted to meet him in person and learn more about his proposal to have her work as an escort. AV1 told BROADY she did not know how she felt about it and that she had never pictured herself doing something like escorting.  After AV1 left, BROADY continued to text her and tell her he was interested in a relationship with her but AV1 told him she was not interested.

31.     On or about March 23, 2025, AV1 decided she needed to accept BROADY's proposal because she needed money.  Around that time, BROADY took photos of AV1 in lingerie and sexual poses.  AV1 said that she ultimately decided to turn

Complaint - 13
*United States v. Broady* / USAO 2025R00181

down BROADY's proposal, since she has her own apartment and did not need to depend on BROADY for anything. AV1 said that to her knowledge, the photos BROADY took of her were never posted online.

**Adult Victim 2**

32.    BROADY also told AV1 he had a woman from Canada, subsequently identified as Adult Victim 2 (AV2) flying to Seattle to live with him but that she was coming strictly for business.  BROADY told AV1 he had known AV2 for about five or six months and that they met online. BROADY does not have a valid driver's license and he instructed AV1 to pick AV2 up from the airport on March 17, 2025.  AV1 did so.

33.    AV2 told law enforcement that she met BROADY on a dating application called "BLK" in early March 2025. According to BLK's website, it is the "number one dating and lifestyle app for the Black community."  AV2 and BROADY "matched" on the app and BROADY was first to reach out to start a conversation. (In my training and experience, matching on a dating application means that two people indicated they are interested in the other's profile, thus allowing them to contact each other through the application.) After BROADY reached out to AV2, she provided her telephone number and they began a texting conversation. Based on their manner of meeting and conversation, AV2 believed that BROADY was interested in a romantic relationship with her.

34.    AV2 showed law enforcement the text messages she had exchanged with BROADY.  I reviewed the messages and took screenshots of these communications, some of which are set forth below.   In these text communications, BROADY and AV2 discussed her coming to visit him and staying with him, as well as how long AV2 could stay in the United States before having to go back to Canada.  BROADY asked AV2 if she would be willing to move to the United States if their relationship became serious. After discussing the difficulty of a long-distance relationship, BROADY stated that they

Complaint - 14
*United States v. Broady* / USAO 2025R00181

could figure something out.  BROADY subsequently sent AV2 a screenshot showing Canadians can usually stay in the United States for up to six months without a visa.

35.    BROADY then sent AV2 a text stating that it could be "tricky" for a Canadian citizen to work in the United States.  He sent another text stating "Unless you wanna strip or break some tricks that's the only way to get payed before your visa [thinking emoji] . . . While visiting the USA . . . Ain't gone lie girls over here be make cake . . . 30 k a month type shit. 304'n."

 

I am aware, based on my training and experience, that the terms "break some tricks" and "304'n" are often used in reference to engaging in commercial sex acts. "304" is often used in place of saying "hoe" (a colloquial term for "whore" or prostitute).  I interpreted these text messages to be BROADY telling AV2 that if she wanted to come to the United States, she could earn a significant amount of money engaging in commercial sex.

36.    BROADY went on to tell AV2 that if she wanted to see other men while visiting him, he will "feed you what we call here game."  Based on my training and

Complaint - 15
*United States v. Broady* / USAO 2025R00181

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

experience, I interpreted this to mean that BROADY would help teach AV2 how to work in the commercial sex industry.

37.     As shown in the screenshots below, BROADY went on to tell AV2: "You would be at least $500-$800 for an hour of ya time. So meaning you would make atleast [sic]2k a day minimum & that ain't even a full 24 hrs. But like I said I'm not exploiting or encouraging this on you. I'm just telling you what it is lol when it comes to fast tax free money you feel me." Continuing the explanation, BROADY discussed posting ads online and having a pimp protector. BROADY stated that he knows "a fair share" of women who do this and claims they are "maken hella money." BROADY further stated that there are rules about what men can and cannot do during a date. He then texted "It's a lot more I won't text. I'm not insecure because you gonna make money for us both. & I know that date can't have you like I can I can go raw and he can't I can kiss you he can't. Like tbh I love a hoe that can make some money & be loyal." The letters "tbh" are typically used as an abbreviation for "to be honest."

 

38.     As shown below, BROADY also stated that "the apps" (presumably, online websites that can be used to advertise prostitution") "take a fee & time to process", but that there was also "what we call blade it's like a strip a street where woman stand get money same way it's just different."  BROADY then assured AV2 that "if you started this life I'd put you only internet."  AV2 responded "Yesss haha I'm tryna make money with my man."



39.     BROADY sent AV2 another series of text messages stating the following: "This shit come & go with that life foreign cars money designer bags etc . . . That's just a sneak peek . . . I've lost a lot I gained a lot . . . The 9-5 is slow but I'll never quit my job again I'll do both if anything manage & protect you & still go to work that way we never lose money income from both ways can never go wrong but with that life it's addicting because the money comes so fast . . . You just turn into somebody else lol"

Complaint - 18
*United States v. Broady* / USAO 2025R00181

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

 

40.     BROADY then sent AV2 a video in which he spread out a large amount of cash.  As set forth below, his accompanying text said "Anyway that right there was made in past in just 8 hrs ain't no fake bills all real but hold I've exposed to much I need you time for 3 seconds make sure you ain't police."  When AV2 did not immediately respond, he sent another series of texts stating "Call me back you must be busy . . . I'm paranoid now."  Based on my training and experience, I interpreted these texts as BROADY being concerned that he has incriminated himself to an undercover police officer about his involvement and experience in prostitution and pimping, and asking for proof that AV2 is not a law enforcement officer.

41.     After AV2 confirmed that she is not a police officer, BROADY responded "You really would bust a date for me? Shit crazy lol."  AV2 replied "I'm slow haha what does that mean? I gotta learn your lingo." BROADY responded "What we just talked about baby. Like this fast money shit. You would be down to do that for us."  During our interview, AV2 told us that she did not have any previous experience with commercial sex, Only Fans, escorting or anything else in the sex trade. However, when BROADY

Complaint - 19
*United States v. Broady* / USAO 2025R00181

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

proposed having AV2 do commercial sex work, she replied "Yeah baby I'm down for that." BROADY then replied that he was going to look for flight options for AV2 to travel from Canada to Seattle.



Complaint - 20
*United States v. Broady* / USAO 2025R00181

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



42.     Upon learning that AV2 was currently unemployed, BROADY suggested setting up her commercial sex "adds" before she arrived but noted that "…but I don't want you starting [to engage in prostitution] until you see me because your not gonna know what to do you need to be trained properly so shit don't happen to you you need protection & guidance with this shit."

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



43.    On March 13, 2025, BROADY purchased AV2's plane ticket for a flight out of Canada on March 17, 2025. After the plane ticket was booked, BROADY told AV2 she needed to start looking up clothes she could wear in Seattle and that they should fit her figure tightly. (Based on my training and experience, pimps and sex traffickers often assist in the purchasing of outfits for the women to wear on their dates.) BROADY also told AV2 to make accounts on Eros and Skipthegames. (I am aware through my training and experience that these websites regularly host advertisements for individuals engaged in commercial sex.) BROADY had to remind AV2 about making an account on Skipthegames and sent her the link. For her Skipthegames bio, BROADY told AV2 to put "Labanese mix princess fulfilling all ya dreams" until she arrives in Seattle and then he would "fix it up."

Complaint - 22
*United States v. Broady* / USAO 2025R00181

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



44.     On March 17, 2025, the day of AV2's scheduled flight to Seattle, BROADY told her there was another woman at his apartment who was asleep but incoherent. AV2 was upset that another woman had spent the night at BROADY's apartment and that he did not tell her sooner. They argued about whether or not she was still going to come to Seattle and AV2 said that she felt disrespected. BROADY replied that the other woman would be leaving to get prostitution dates and that "money is coming." AV2 was already at the airport when she learned about this other woman. She boarded the flight and told BROADY not to pick her up from the airport if the other woman was not gone from the apartment. BROADY told AV2 that "the bitch is gone" and he would see her at 8 p.m. when she landed. BROADY later messaged AV2 and told her that he asked someone else to pick her up. (AV1 was the person who picked AV2 up from the airport.) AV2 was upset with BROADY for not picking her up and for sending someone she had never met to meet her. They ended up deciding to talk about the issue

Complaint - 23
*United States v. Broady* / USAO 2025R00181

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

later.  BROADY gave AV2 the door code to his apartment, which was the SUBJECT PREMISES.

45.     AV2 advised that after she arrived in Seattle, she engaged in commercial sex acts twice at BROADY's instruction.  The first date occurred on or about March 21, 2025.  BROADY scheduled the date using a phone that he used to answer responses to AV2's online advertisements, but made AV2 answer the phone.  AV1 drove AV2 and BROADY to meet with the sex purchaser, although she did not know when she picked them up what the purpose of the trip was.  AV1 still had the location saved in her Google Maps application and confirmed that the address was 32510 Pacific Hwy S in Federal Way, Washington.   According to AV2, the location where she met the sex purchaser was a hot tub place that had rooms with a sauna, hot tub, and a bed.  I have confirmed that a business called "Elliott Bay Sauna & Hot Tub Co" is located at this address, and that individuals may rent rooms with hot tubs.  The business closes at midnight.

46.     Prior to the "date," BROADY instructed AV2 to charge $300 for 30 minutes and $600 for 60 minutes.  The "date" lasted 30 minutes and the sex purchaser gave AV2 $300.  As soon as AV2 got in the car, BROADY instructed her to give him the money.

47.     On or about March 24, 2025. AV2 told BROADY that she received a message for a date and asked BROADY what "DATY" and "MSOG" meant. At first BROADY said he did not know what that meant but then told AV2 they meant "Romantic date" and "Multiple cum." He asked AV2 how much the buyer was going to pay. AV2 replied the buyer said he wanted an hour and would book a room.  AV2 told the buyer to book a room at either the Travelodge or Hyatt.   The buyer booked a room at the Travelodge, near the Space Needle and BROADY's apartment.  BROADY dropped AV2 off so she had to walk to the hotel. The date lasted one hour and the purchaser paid AV2 $600 for the date. BROADY parked away from the hotel so AV2 had to walk to meet him in his car after the date. AV2 said that BROADY drove a 1999 Mercedes. After

Complaint - 24
*United States v. Broady* / USAO 2025R00181

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

the date, BROADY made her give him the money again. Below is a snapshot from a video in BROADY and AV2's text thread showing AV2 giving the money from the date to BROADY.



I have reviewed the full video and confirmed that AV2 was in the video and BROADY appears to be the one filming the video.

48.     AV2 stated that BROADY had several rules regarding the booking and conduct of dates, including that AV2 had to pre-verify the sex purchase by speaking on FaceTime.  BROADY also told AV2 that during this call she had to ask to see the buyer's genitals. BROADY's stated rationale for this requirement was that if the buyer was law enforcement, he would not be able to show his genitals and they would know not to book with him.  BROADY's other rules for AV2 included asking for the money at the start of the date; no anal sex; no oral sex performed by the customer; no kissing; only missionary-style vaginal intercourse; using condoms at all times; condom use at all times, and no "back shots." (In my training and experience, back shots means sexual intercourse where the man is behind the woman.) BROADY said that if the man wanted any of these options, there would be an extra charge.

Complaint - 25
*United States v. Broady* / USAO 2025R00181

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

49.     AV2 advised that during her time with BROADY, he was violent and threatening on multiple occasions. I have reviewed several text message interactions between AV2 and BROADY that corroborate this claim. AV2 said that during altercations, BROADY would pull AV2's hair, put his arm around her neck, and lay on top of her. AV2 further stated that on March 23, she and BROADY were having an argument and he said that he would put her in the grave.  On March 25, 2025, BROADY was drunk and high on cocaine. AV2 was laying in BROADY's bedroom when he got upset with her, pulled his gun out and told her she needed to listen to him. AV2 remembers that when he pulled the gun out, it made a clicking noise. AV2 described the gun as a black and grey handgun.

50.     I am aware that BROADY is a convicted felon and is legally prohibited from possessing a firearm.  I have reviewed BROADY's criminal history and learned that he was convicted of Felony Armed Robbery in Stafford County, Virginia on December 29, 2006 and sentenced to fifteen years in prison.  AV2 said she believes BROADY's cousin may be involved in helping BROADY acquire guns because she overheard a phone conversation where BROADY was talking about trying to get another gun.

51.     AV1 and AV2 stated that the two of them spent time together with BROADY.  AV1 was often the one who drove since she was the only one with a valid license. Both AV1 and AV2 reported that BROADY always carried a handgun wherever they went. They both recalled a trip to Wal-Mart when BROADY became upset and yelled at AV1 and AV2 in the store.

52.     After these incidents, AV2 became fearful for her life and safety.  She also did not want to engage in commercial sex acts any more.  AV2 accordingly decided to leave BROADY.  On March 27, 2025, AV2 left BROADY's apartment and went to stay with AV1 until she could get a flight back to Canada. AV2 communicated with BROADY via text message.  BROADY told AV2 he had $280 left from AV2's $600 date and "You can book a ticket if you want. Tired of your mouth. Anything your short

Complaint - 26
*United States v. Broady* / USAO 2025R00181

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

on I'll pay from my check. Start looking at Priceline." When AV2 did not respond, he said sent AV2 a text stating "you ignoring me."

53.     After AV2 left, BROADY sent a number of threatening messages to AV2s phone. As set forth below, these included the following messages: "wya bitch . . . I'm on your ass I know where you sleep . . . I'm hurt . . . You betrayed me . . . You dirty whore! . . . I'm comen for both yall. Watch. Fuck you bitch. Laugh now cry later. If you got my baby Ima do you like the last."

Complaint - 27
*United States v. Broady* / USAO 2025R00181

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970





Complaint - 28
*United States v. Broady* / USAO 2025R00181

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

54.    The messages continued with "I'm otw to your crib. Katlynn. Better move her car. My bitch bout to torch…..I HATE YOU. YOUR A TRADER." "If I catch any one of you outside Ima have my Cuzzen whoop yall….I hope both yall get raped running if with my game."



55.    At one point, BROADY showed his location which was in the parking lot of AV1's address. BROADY then texted "I got yall location. It's up! Stupid ass. See you soon faggot!"

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



56.     Based on the above occurrences, AV1 and AV2 are both extremely frightened of BROADY. On April 3, 2025, AV1 had a civil restraining order served to BROADY at his residence 100 North Taylor Ave, Apartment A220, Seattle (the SUBJECT PREMISES).  AV1 hired a private investigator to serve the civil restraining order on BROADY.  The below photograph is a screenshot from the body camera worn by the private investigator during his service of the restraining order.  The investigator sent it to AV1 to show proof of service of the restraining order.

Complaint - 30
*United States v. Broady* / USAO 2025R00181

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



Apr 3, 2025 20:26:39
47.6189N 122.3459W ±82.43m
Seattle, King County 98109
United States

57.     As of April 5, 2025, AV2 has left the United States and traveled back to Canada.

**Other Involvement in Prostitution/Sex Trafficking**

58.     In addition to these most recent events, BROADY has been on law enforcement's radar for trafficking and violence since at least March 2023.

59.     In March 2023, a woman named J.M, who was seen with BROADY by hotel staff in Portland, Oregon made a report to the Portland Police Bureau (PPB) that BROADY had a woman working for him in prostitution.  J.M. did not provide a description of the woman and was unwilling to provide any additional information. PPB officers found advertisements for J.M. that had been posted in the Seattle area, so PPB officers sent the information for awareness to an officer in Bellevue, King County, and Seattle FBI. No investigation was opened by any agency at that time.

60.     In August 2024, Washington State Department of Corrections (DOC) Community Corrections Officer (CCO) Steve Abbott sent an alert to King County DOC regarding BROADY being found in possession of a firearm after brutally beating his girlfriend. I have reviewed BROADY's NCIC report and it shows that BROADY was arrested on July 3, 2024 by the Snohomish County Sheriff's Office and charged with

Complaint - 31
*United States v. Broady* / USAO 2025R00181

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Robbery in the First Degree, Unlawful Possession of a Firearm in the First Degree, Theft in the First Degree, Assault in the Fourth Degree, Interfering with Domestic Violence Reporting, and Possession of a Stolen Firearm. According to the NCIC report, these charges were subsequently dismissed.

61. In November 2024, a woman who described herself as BROADY's former girlfriend made a complaint was made to Lynnwood Police Department. The former girlfriend stated that she was working for BROADY in prostitution. She further stated that she had been dating BROADY for approximately a year and he had physically abused her during that time. When she tried to hide money from him, he assaulted her and mentioned he possessed a Glock firearm.

//

//

Complaint - 32
*United States v. Broady* / USAO 2025R00181

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Based on the above facts, I respectfully submit that there is probable cause to believe that SHANTE BROADY did knowingly and intentionally commit the offense of Sex Trafficking of an Adult Female (AV2) by Force, Fraud, and Coercion, in violation Title 18, United States Code, Sections 1591(a)(1) and 1591(b)(1) and the offense of Transportation of an Adult Female (AV2) for the Purpose of Prostitution through Coercion and Enticement, in violation of Title 18, United States Code, Section 2422(a).

_____
ANNE BORGERTPOEPPING
Special Agent
Federal Bureau of Investigation

The above-named Special Agent provided a sworn statement attesting to the truth of the foregoing Complaint and Affidavit. Based on the Complaint and Affidavit, the Court hereby finds there is probable cause to believe the Defendant committed the offenses set forth in the Complaint.

Dated this __9th__ day of April, 2025.

_____
MICHELLE L. PETERSON
United States Magistrate Judge

Complaint - 33
*United States v. Broady* / USAO 2025R00181

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970